UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF KENTUCKY

IN RE:

JEFFERY A. SEXTON and
MARILYN C. SEXTON

          Debtors                        CASE NO. 13-30569

                                       CHAPTER 7

JEFFERY A. SEXTON and
MARILYN C. SEXTON

          Plaintiffs

vs.                                      Adv. Proc. No. 13-03029

PHEAA

          Defendant

---

## MEMORANDUM-OPINION

---

      THIS ADVERSARY PROCEEDING comes before the Court following the trial held on October 6, 2014.  Plaintiff seeks an Order from the Court concluding that Plaintiff's student loan debt may be discharged under 11 U.S.C. § 523(a)(8).[1]  As discussed below, the Court concludes that Plaintiffs loans may not be discharged.

      This Court has jurisdiction over the subject matter and the parties under 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding under 28 U.S.C.§ 157(b)(2)(A) and (I).

---

[1] Plaintiff's complaint also challenged the constitutionality of 11 U.S.C. § 523(a)(8). Plaintiff has not pursued that argument, however, so the Court treats it as waived.  *See also Gragg v. Kentucky Cabinet for Workforce Development*, 293 F.3d 958, 963 (6th Cir. 2002) ("Ordinarily, we will not consider issues that have not been fully developed by the briefs or in the record.").

## Findings of Fact

Plaintiff Jeffrey A. Sexton ("Mr. Sexton") attended the University of Louisville Brandeis School of Law from 1989 to 1992. Mr. Sexton financed his attendance at the law school with a federal student loan (the "Loan"). The promissary note signed by Mr. Sexton in 1992 lists the principal of the note as $28,351.74. The payment plan selected by Mr. Sexton included a 9.00% interest rate. The original repayment schedule outlined in the note provided that Mr. Sexton would repay a total of $63,345.60 on the Loan, which included interest payments totaling $34,993.86. To date, Mr. Sexton has repaid $52,246.62 on the Loan. Due to the accrual of interest over the past 22 years, $41,967.70 remains outstanding on the Loan.[2]

After graduation, Mr. Sexton went to work at Greenebaum, Doll, & McDonald, a Louisville-based law firm. Starting in January 1993, Mr. Sexton began making payments on the Loan. The payments lasted through October 1993. At that point, payments on the Loan stopped until Mr. Sexton made a single payment in May 1996. This coincides with Mr. Sexton's attendance at the Patterson School of Diplomacy and International Commerce at the University of Kentucky, where Mr. Sexton received a master's degree in December 1995. During the period of non-repayment and all subsequent periods of non-repayment, interest accrued on the Loan.

Starting in July 1996 Mr. Sexton made two monthly payments on the Loan. Afterward, he made no payments on the Loan until August 1997. No reason was given for this stop in payments, but Mr. Sexton suggests that payments might have been made to other student loans during this period that would not have been recorded against this Loan.

Beginning with the payment made in August 1997, Mr. Sexton made regular payments on the Loan through August 2005. The payments ranged from $298.19 to $400.00 over the period. The amount of monthly interest on the Loan during this period started at nearly $300 and dropped to around $250 as payments above interest were made on the Loan. The balance on the principal of the Loan, however, only decreased from $38,838.07 in 1997 to $29,717.67 in 2005. The payments

---

[2]Mr. Sexton has three student loans remaining from his undergraduate/graduate education. Two of the loans are not at issue in this case; Mr. Sexton has agreed to repay those loans on modified terms.

2

made by Mr. Sexton over the eight years never covered much more than the interest accrued on the Loan.

Mr. Sexton quit making payments on the Loan from August 2005 until April 2007. This period coincides with Mr. Sexton's attendance at the University of Chicago Booth School of Business, where Mr. Sexton received his MBA in 2007. Starting in April 2007, Mr. Sexton resumed making regular payments on the Loan. There were several late fees applied to the repayments that occurred during this period. In February 2008, the late payments stopped and regular payments resumed until March 2009. Afterward, Mr. Sexton made no further payments on the Loan for the remainder of 2009. He made one payment in February 2010, but that was the only payment for that year. He made no payments in 2011. The final payments made against the Loan were a block of payments made monthly from September 2012 through February 2013. In February 2013, Mr. Sexton filed for Chapter 7 relief.

From 1997 to 2003, Mr. Sexton worked at Merrill Lynch. After leaving Merrill Lynch, Mr. Sexton went to work at Morgan Stanley. In 2007, a small investment firm in Los Angeles hired Mr. Sexton to manage a fund for them, but it failed when the financial markets crashed in 2008-09. In the five years leading up to the market crash, Mr. Sexton made $934,867.00. The market crash caused the Mr. Sexton and his wife, Marilyn C. Sexton ("Mrs. Sexton"), to liquidate their investments and their IRAs. After the failure of that fund, Mr. Sexton worked as a self-employed portfolio manager, managing two investment advising firms; Arsenal Investment Advisors, LLC, and Superstition Economics, LLC. Both of these firms were ultimately unsuccessful and failed by 2012.

After the failure of his investment advising firms, Mr. Sexton looked for work in Louisville, Kentucky. Mr. Sexton testified that he sought employment with some of the larger law firms in Louisville but was unsuccessful. Mr. Sexton provided no evidence that he formally applied for these jobs. Mr. Sexton testified that he had "burned bridges" at both Morgan Stanley and Merrill Lynch when he left those firms in the early 2000's, making it unlikely that he will be able to return to employment at either of these financial firms. Mr. Sexton testified that, after discussions with various CEOs and managing partners, he believed that he had little hope of future employment with the larger financial employers or law firms in Louisville.

As of the bankruptcy filing, Mr. Sexton is working as a solo practitioner in his legal practice,

3

Sexton, PLC.  Mr. Sexton represents criminal clients and clients in bankruptcy.  Mr. Sexton made $22,640.00 from his law practice in 2013.  Mr. Sexton estimates the cost of running his business at $1,500.00 a month and estimates his current income from Sexton PLC as $15,000 year to date.  He testified that he has cut costs as much as possible and works out of his home.

Mrs. Sexton worked as a pharmaceutical sales representative for Pfizer, Inc. until she lost her job in July 2011.  In 2010, Mrs. Sexton made $122,253.00.  In 2011, despite being terminated in July, she earned $123,337.00. In the years preceding her termination, Mrs. Sexton was earning a considerable salary from her employment, often above $100,000.  Since 2013, Mrs. Sexton has been employed with Avanir Pharmaceuticals, where she receives an annual salary of $85,000.00.

The Sextons have four children.  The two oldest children attend Kentucky Country Day School, a private school in Louisville, Kentucky.  The total cost of tuition for both of the children was negotiated down by Mrs. Sexton to $508.00 a month.  As a part of these post-petition negotiations, the Sextons signed a promissory note and agreed to assume debts that might otherwise have been discharged in the bankruptcy proceeding, despite the Court's having denied the Sexton's motion to reaffirm the debt.[3]  One of the Sexton's children has a growth hormone deficiency and requires medication that, according to Mr. Sexton, can cost as much as $1,800 a month.  The Court notes, however, that the Sexton's list the cost for the medication as $300 a month in the estimated budget.  Additionally, the Sexton's list monthly cable and phone expenses of $600.00. Other expenses include $800 per month on cleaning, cutting grass, and child care, and $1,700 on food, including $500 a month for meals outside of household.

## Conclusions of Law

Under 11 U.S.C. § 523(a)(8), student loan debt is nondischargeable in bankruptcy unless "excepting such debt from discharge . . . would impose an undue hardship on the debtor and the debtor's dependents."  The term 'undue hardship' is not defined by the Bankruptcy Code.  As a result, courts have supplied the definition.  The Sixth Circuit has adopted the most commonly used test for the determining whether an undue hardship exists; the three-part approach created by the Second Circuit. *Brunner v. N.Y. State Higher Educ. Serv. Corp.* (*In re Brunner*), 831 F.2d 395 (2d

---

[3]On August 9, 2013 the Court entered an Order denying the reaffirmation agreement between the debtors and Kentucky Country Day School in the amount of $49,152.03.

4

Cir. 1987). *See Oyler v. Educ. Credit Mgmt. Corp.* (*In re Oyler*), 397 F.3d 382 (6th Cir. 2005).

The *Brunner* test requires that a debtor meet three criteria:

> (1) that the debtor cannot maintain, based on current income and expenses, a 'minimal' standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Brunner*, 831 F.2d at 396.

### A. Can Mr. Sexton maintain a minimal standard of living if the Loan is not discharged?

Under the first part for the *Brunner* test, a Plaintiff must show that he or she cannot maintain a minimal standard of living if forced to repay his or her student loan based on his or her financial status at the time of the trial. *Nixon v. Key Educ. Res.* (*In re Nixon*), 453 B.R. 311, 326 (Bankr. S.D. Ohio 2011). Courts look at a variety of factors to determine what a minimal standard of living entails. A minimal standard certainly includes the most basic essentials, such as clothing, food, and shelter. *See Rice v. United States* (*In re Rice*), 78 F.3d 1144, 1151 (6th Cir. 1996) ("the bankruptcy court must ascertain what amount is minimally necessary to ensure that the dependents' needs for care, including food, shelter, clothing, and medical treatment are met.")

Some courts, however, have not limited debtors to the bare necessities listed in *Rice*. For example, in *Nixon,* the court looked at two ends of the financial spectrum; the debtor's "preexisting" standard of living compared to a reduction in standard of living that would leave the debtor "reduced to poverty." *Nixon*, 453 B.R. at 327 (citing *Educ. Credit Mgmt. Corp. v. Stanley* (*In re Stanley*), 300 B.R. 813, 818 (N.D. Fla. 2003) and *Campton v. U.S. Dep't of Educ. (In re Campton)*, 405 B.R. 887, 891 (Bankr. N.D. Ohio 2009)). Such courts expect individuals to make reductions in their spending that might impact their standard of living, but it is not anticipated that individuals will reduce themselves to the level of poverty. *See Tenn. Student Assistance Corp. v. Hornsby (In re Hornsby)*, 144 F.3d 433, 437-38 (6th Cir. 1998).

Some courts have gone into great detail, providing a list of factors that the court analyzed

5

to determine whether a minimal standard of living was met. *See, e.g., Ivory v. United States (In re Ivory)*, 269 B.R. 890 (Bankr. N.D. Ala. 2001). The scope of the list given in *Ivory* is useful and instructive, but it is not exhaustive. Generally, the courts are given leeway to determine what expenses qualify as minimal and are not bound to such a rigid list. *See Miller v. Sallie Mae, Inc. (In re Miller)*, 409 B.R. 299, 312 n.26 (Bankr. E.D. Pa. 2009) ("The court must be prepared to depart from the list based on its own experiences, common sense, knowledge of the surrounding area and culture, and assessment of the reasonableness of what the debtor claims he or she needs.").

Perhaps the clearest evidence that a debtor has satisfied the first prong of *Brunner* is for the debtor to "minimize expenses." *Lykoudis v. Fla. Dep't of Educ.*, 381 B.R. 349, 355 (Bankr. M.D. Fla. 2007). To determine whether a debtor has minimized his or her expenses, courts look at the expenditures presented in the record. Any frivolity or unnecessary expenses stand out as indicia that the debtor has alternatives means of improving his or her financial situation without requiring the court to absolve their student loan debt. *See Hornsby*, 144 F.3d at 438 (questioning "an exorbitant bill for long distance telephone service or the [debtors'] monthly bill of $100 for cigarettes.").

In the present case, Mr. Sexton cannot credibly claim that he has minimized expenses. Although he argues that he and his family maintain a meager subsistence, certain expenses raise doubts as to whether the Sextons *actually live* at a "minimal" standard of living. First, paying $508 per month for private school for two of his children seems extravagant. The Court understands that the Sextons want the best education for their children. Private education, however, constitutes a luxury here, where Mr. Sexton provided no evidence of any special needs that would not be met by public schools or that the education provided by public schools in Louisville is otherwise inadequate. This fact alone shows that Mr. Sexton has not cut expenses to a minimal standard. To get relief from student loan debt, the debtor must be in a situation where they cannot lower expenses further without falling below a minimal threshold. *See Nixon*, 453 B.R. at 326.

Second, Mr. Sexton has an average monthly telephone bill of around $600. Although the telephone bill includes cell phone and cable usage, this rate seems excessive to the Court. Additionally, the Sextons have listed the cleaning of their house, cutting grass, and child care at $800 per month. Under the first prong of the *Brunner* test, a student loan should only be discharged in those cases where expenses have been lowered to a minimum and the debtor *still* cannot afford

6

to make payments on the loan. (*See Ammirati v. Nellie Mae Inc. (In re Ammirati)*, 187 B.R. 902, 907 (D.S.C. 1995) (where a debtor, though living above the poverty line, had medical expenses and proved to the court that they "had done everything possible to minimize expenses and maximize income."), *aff'd*, 85 F.3d 615 (4th Cir. 1996)).  Courts want to see considerable effort to lower expenses. *See Correll v. Union Nat'l Bank of Pittsburgh (In re Correll)*, 105 B.R. 302, 306 (Bankr.W.D.Pa. 1989) ("Where a family earns a modest income and the family budget, which shows no unnecessary or frivolous expenditures, is still unbalanced, a hardship exists from which a debtor may be discharged of his student loan obligations.").

After a review of the expenditures in the record, this Court cannot conclude that Mr. Sexton can satisfy the first prong of the *Brunner* test.  The cost of private tuition, coupled with the generally high amount spent on telephones, cleaning services, and child-care, militate against the argument that the Sextons have adopted a minimal standard of living.

**B. Are there additional circumstances that suggest that the state of affairs in likely to exist for a significant portion of the repayment period?**

The second prong of the *Brunner* test requires proof that the state of affairs is likely to continue into the foreseeable future, covering the majority of the repayment period on the loan.  To satisfy this prong, debtors need to "show that circumstances indicate a 'certainty of hopelessness, not merely a present inability to fulfill financial commitment.'"  *Oyler*, 397 F.3d at 386 (citing *In the Matter of Roberson*, 990 F.2d 1132, 1135 (7th Cir. 1993)).  These circumstances must be more difficult to overcome than ordinary circumstances commonly associated with a bankruptcy proceeding (*Educ. Credit Mgmt. Corp. v. Frushour (In re Frushour)*, 433 F.3d 393, 401 (4th Cir. 2005) ("It most clearly reflects the congressional imperative that the debtor's hardship must be more than the normal hardship that accompanies any bankruptcy.").  The additional circumstances that the debtor experiences "must be 'beyond the debtor's control, not borne of free choice.'" (*Barrett v. Educ. Credit Mgmt. Corp. (In re Barrett)*, 487, F.3d 353, 359 (6th Cir. 2007) (citing *Hornsby*, 144 F.3d at 438)).

There must be specific instances in which additional circumstances prevent the debtor from finding employment that would improve their situation and allow them to pay off the student loans.  Additional circumstances "may include, but are not limited to, illness, disability, a lack of usable

job skills, or the existence of a large number of dependents." *Nixon*, 453 B.R. at 330 (citing *Barrett*, 487 F.3d at 359). It is not enough to allege that some additional circumstances prevent the debtors from realizing their potential. The debtor must "precisely identify her problems and explain how her condition would impair her ability to work in the future." *Tirch v. Pa. Higher Educ. Assistance Agency (In re Tirch)*, 409 F.3d 677, 681 (6th Cir. 2005).

Mr. Sexton cannot satisfy the second prong of the *Brunner* test. Here, Mr. Sexton testified that his reputation and past experiences render him unemployable with the major financial firms and top law firms in Louisville. The Court does not find this testimony credible or persuasive. Mr. Sexton provided no evidence that he ever formally applied for work with any of those "major financial firms" or "top law firms." Moreover, nothing prevents Mr. Sexton from seeking work at less exalted places. He provided no evidence that he applied to *any* law firm or financial firm, small or large. Accepting a lower income job despite having the qualifications for more rewarding employment is not an 'additional circumstance.' *See Oyler*, 397 F.3d at 386 (a debtor's choice of work "cannot excuse his failure to supplement his income so that he can meet knowingly and voluntarily incurred financial obligations. By education and experience he qualifies for higher-paying work and is obliged to seek work that would allow debt repayment before he can claim undue hardship."); *Healey v. Massachusetts Higher Educ. (In re Healey)*, 161 B.R. 389, 395 (E.D.Mich. 1993) ("A resolute determination to work in one's field of dreams, no matter how little it pays, cannot be the fundamental standard from which 'undue hardship' . . . is measured."). A debtor must work diligently to improve their financial condition before they can satisfy the definition of undue hardship.

Mr. Sexton has not done everything in his power to maximize his earning potential. First, a much more rigorous job search might yield a job that pays more than Mr. Sexton's current $15,000 annual income. In fact, there are likely many jobs that will earn Mr. Sexton more than he is currently making with his fledgling legal practice. Yet Mr. Sexton failed to provide any evidence that he looked for work in any other area for which his fine education make him eminently qualified.

Even if Mr. Sexton is set on maintaining a legal practice, this Court is perhaps more optimistic for his success than he is. Mr. Sexton has only been practicing for a short period of time, yet this Court notes several bankruptcy cases pending that list Mr. Sexton as the attorney of record.

There is nothing to suggest that Mr. Sexton's current income of $15,000 annually is a good indicator of limited future potential.  Mr. Sexton has nothing to stop him from earning a considerable amount of money in the future with his law practice, even if he never returns to his peak pre-bankruptcy salary.

### C. Did Mr. Sexton make a good faith effort to repay the Loan?

The 'good faith' prong of the *Brunner* test requires analyzing the totality of a debtor's circumstances.  Often, this means there will be some overlapping with the previous two prongs of the test.  The Sixth Circuit Court of Appeals offered the following guidance:

> [T]he court should examine the debtor's previous efforts to repay the [student loan] obligation, including the debtor's financial situation over the course of time when payments were due; the debtor's voluntary undertaking of additional financial burdens despite his knowledge of his outstanding [student loan] debt; and the percentage of the debtor's total indebtedness represented by student loans.  In other words, we believe the debtor's good faith to be an appropriate and necessary consideration.

*Rice*, 78 F.3d at 1150.  Courts have used the three factors provided by the Sixth Circuit in *Rice* to determine whether good faith has been met.  *See Nixon*, 453 B.R. at 333.  The court will want to see that the debtor "was attentive to the obligation." *Id.* at 334.

Built into the federal student loan program is the availability of deferments and forbearance.  Either of these programs are used when an individual is unable to make payments on student loans due to a lack of income or for other justifiable reasons.  Despite temporarily absolving an individual of the right to pay back their student loans, a deferment may be evidence of a good faith effort to repay the loans.  *See Brunner*, 832 F.2d at 397.  Courts will find that a good faith effort has been made to repay the student loan where the debtor makes regular payments on the loan when they are able and where the debtor is attentive to the status of the loan.  Seeking deferments can be an indication that a debtor was pro-active about the debt and "not merely ignoring it." *Nixon,* 453 B.R. at 334.

Using the factors given in *Rice*, Mr. Sexton cannot satisfy the good faith requirement.  Looking at the previous efforts to repay the Loan, two facts stand out to the Court.  First, while Mr. Sexton made regular payments on the Loan at intermittent times during the past 22 years, these regular payments almost never amounted to more than the interest on the Loan.  For example, Mr. Sexton made regular payments from 1997 to 2005, but the payments never equaled much more than

the accrued interest on the Loan.  Thus, at the end of that eight year period, the outstanding loan balance had only dropped by roughly $9,000.

The second fact that stands out to the Court is the seven years in which the Court assumes that Mr. Sexton obtained a forbearance on the Loan and was not required to make payments.[4] During this time, even though Mr. Sexton was not paying off the student loans, he must have been aware that they were accruing interest.  In fact, if the forbearance periods related to times when Mr. Sexton was getting his master's degree or his MBA, then he should have been keenly aware of the status of his loans since he received additional student loans to pay for those programs.

Mr. Sexton's testimony in court that "I honestly believed that I had paid this loan off, given the large amount of money that was going towards it" is particularly damning. Transcript of Trial on November 4, 2014, p. 20.  Mr. Sexton must have known that with his forbearance periods and the fact that his payments were barely over the 9% interest rate, it would take quite a long time to pay off the Loan.  Mr. Sexton also testified, "It was never my intention to let [the student loan] go 20 years . . . I was making good money.  And I was making a lot of payments towards these loans." *Id.*  In reality, Mr. Sexton appears to have completely ignored the Loan.  He *was* making good money and could have easily paid much more towards the Loan.  But, he did not.  In fact, his payments seem to have been changed only by an automatic increase in the payment schedule, not by any effort to pay the Loan off faster.  Also, there was a period of repeated late fees.

It is possible that Mr. Sexton sees as unjust the fact that the Loan that has been around for 22 years yet has a value higher than its initial principal.  However, this is the nature of compounding interest.  An attentive individual realizes that a loan is a growing obligation and would make efforts, when able, to pay the Loan off or to at least recognize that a loan has the potential to exist in perpetuity if little more than the interest is paid off each month.

Additionally, the second *Rice* factor encourages the Court to look at whether other debt obligations were taken on in addition to the student loans.  The evidence in the record on this factor is scarce, but it is worth noting that Mr. Sexton did take out two additional student loans during the

---

[4] The Court makes this assumption based on testimony made at trial and the fact that no penalties for missed payments were assessed on the loans during the periods given.  It would be far worse to assume that no forbearance was requested, because this would be clear evidence of a lack of good faith.

repayment period on this loan. This suggests that Mr. Sexton was not adverse to taking on more student loan debt when it benefitted his educational pursuits. Mr. Sexton must have been made aware of the status of his previous loans. An individual cannot be acting in good faith if they accrue additional loans without looking into the status of their previous related loans.

The third and final *Rice* factor relates to whether the discharge of student loan debt is a motivating factor in the filing for bankruptcy. *See Nixon*, 453 B.R. at 335. It is apparent in this case that the Sextons filed for bankruptcy for reasons not related to student loan debt. This is not an issue in this case; the Sextons are not trying to abuse the bankruptcy procedure to get out of student loan debt in bad faith.

Mr. Sexton's general apathy towards the repayment of this loan does not support a finding of good faith.

<u>Conclusion</u>

For the foregoing reasons, the Court finds in favor of PHEAA and concludes that Mr. Sexton's liability on the Loan cannot be discharged under 11 U.S.C. § 523(a)(8).

A separate Order consistent with the foregoing has been entered in accordance with Federal Rule of Bankruptcy Procedure 9021.

11